

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Caribbean Communications Solutions y otros<br><br>　　　　Recurridas<br><br>　　　　　　v.<br><br>Policía de Puerto Rico, Junta de Subastas de la Policía de Puerto Rico; Junta de Reconsideración de la Administración de Servicios Generales<br><br>　　　　Peticionarias | Certiorari<br><br>2009 TSPR 147<br><br>176 DPR \_\_\_\_ |

Número del Caso: CC-2007-1061
　　　　　cons. CC-2007-1065

Fecha: 24 de septiembre de 2009

Tribunal de Apelaciones:

　　　　Región Judicial de San Juan-Panel IV

Juez Ponente:
　　　　　　　Hon. Lourdes Velásquez Cajigas

Oficina del Procurador General:

　　　　　　Lcdo. Luis José Torres Asencio
　　　　　　Procurador General Auxiliar

　　　　　　Lcdo. Pedro J. Cabán Vales
　　　　　　Procurador General Auxiliar

Abogado de Telefónica Larga Distancia de P.R., Inc.

　　　　　　Lcdo. Miguel E. Bonilla Sierra

Abogados de la Parte Recurrida:

　　　　　　Lcdo. Miguel J. Rodríguez Marxuach
　　　　　　Lcda. Brenda L. Cordero Acaba
　　　　　　Lcda. Maribel G. Rubio Bello

Materia: Impugnación de Subasta

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correccione s del proceso de compilación y publicación oficial de las decisio nes del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Caribbean Communications
Solutions y otros

    Recurridas

    v.

                                CC-2007-1061   Certiorari

Policía de Puerto Rico;
Junta de Subastas de la      Cons.CC-2007-1065
Policía de Puerto Rico;
Junta de Reconsideración de
la Adm. de Servicios Generales

    Peticionarias

Opinión del Tribunal emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 24 de septiembre de 2009.

En esta ocasión, debemos resolver si es válido un procedimiento de subasta gubernamental híbrido mediante el cual se cumplen todos los requisitos de una subasta formal establecidos en el reglamento aplicable, pero se incorporan mecanismos de aclaración y participación propios de una subasta informal. Por entender que el procedimiento en controversia no es contrario al interés público y fomenta la transparencia y libre competencia en los procedimientos de subastas gubernamentales, contestamos dicha interrogante en la afirmativa. Asimismo, resolvemos que la adjudicación de la buena pro de la subasta en el caso de autos respondió a un ejercicio razonable de discreción por parte de la

agencia. Por lo tanto, revocamos la sentencia del Tribunal de Apelaciones que determinó lo contrario.

I

Los hechos de este caso no están en controversia. Con el propósito de suscribir un contrato para la implantación de un sistema de vigilancia inteligente en Puerto Rico, la División de Compras de la Policía de Puerto Rico emitió en agosto de 2006 la Invitación a Subasta Formal Núm. 2006-035-026-R-1. La Policía interesaba obtener un sistema de la más alta calidad y tecnología como herramienta para expandir su vigilancia en las áreas de mayor incidencia criminal del País. El sistema consistiría en la colocación de cámaras de vídeo en dichas zonas, las cuales la Policía monitorearía electrónicamente desde centros de mando regionales que se ubicarían en cualquiera de sus trece comandancias de área. A su vez, el centro de mando principal se establecería en el Cuartel General de la Policía ubicado en el Municipio de San Juan. El sistema incluiría la transferencia y el almacenamiento de las imágenes obtenidas mediante las cámaras, así como mecanismos de seguridad para prevenir intrusiones en la red.

La referida invitación fue acompañada por un documento preparado por el Negociado de Tecnología y Comunicaciones de la Policía, titulado "Request for Proposal" (RFP), en el cual se detallaron las condiciones y especificaciones requeridas a los participantes de la subasta. Según el RFP, las ofertas debían incluir la provisión e instalación de equipo

("hardware"), programación ("software") y servicios de líneas de comunicación. El propósito era obtener un sistema de vigilancia digital listo para ser utilizado por la Policía. Cabe señalar que el RFP es un documento extenso que incluyó aproximadamente 296 especificaciones particulares sobre el equipo y 284 sobre la programación.

En lo concerniente al caso de autos, el RFP estableció como único criterio de evaluación de propuestas el cumplimiento del proponente con todas las especificaciones contenidas en el documento. Como requisito obligatorio, el RFP incluyó la provisión de los documentos técnicos o literatura de los productos que formaran parte de cada propuesta pues, de lo contrario, no se evaluaría la misma. Además, se estableció como una de las condiciones especiales que el Negociado de Tecnología podía solicitar discusiones verbales con los proponentes si dicho organismo lo estimaba necesario. Sin embargo, se hizo constar que las propuestas se considerarían finales y no podrían ser alteradas luego de ser recibidas.[1]

Conforme a las Secciones 3 y 15 del RFP, éste incorporó una tabla de precios que incluyó las cantidades de equipo necesario para la configuración de un sistema típico de vigilancia inteligente de 200 cámaras de montura fija y 50

---

[1] A tales efectos, la Sección 1.8 del RFP lee:

> The Customer, if necessary, can request from the Proposers oral discussions, system presentations, and demonstrations of existing operational systems of solution. The pricing proposal, however, will be considered final and cannot be altered after received.

cámaras ajustables por control remoto (denominadas *Pan/Tilt/Zoom* o PTZ). De igual forma, incluyó cantidades determinadas de otros equipos, programas y líneas de comunicación necesarias para la transmisión de información – incluyendo la instalación y configuración de todo lo anterior–, así como los cargos recurrentes mensuales por la renta de dichas líneas. Es importante destacar que las cantidades incluidas en dicha tabla correspondieron a una configuración típica de un sistema de vigilancia inteligente. En este sentido, como parte de la descripción incluida en la invitación a la subasta, se hizo constar que las cantidades podrían variar conforme a las necesidades de la agencia.

El RFP estableció como requisito compulsorio que se cumplimentara la referida tabla de precios utilizando el precio unitario y extendido de cada artículo. En cuanto a este último aspecto, la Policía emitió un aviso de enmienda en el cual aclaró que en las partidas de cargos recurrentes de la renta de las líneas de transmisión de datos el precio unitario sería el cargo de un mes de renta y el precio extendido sería la cantidad de líneas multiplicada por el precio unitario.

La Policía concedió un término a los posibles licitadores para que sometieran sus dudas sobre las condiciones y especificaciones de la subasta. De conformidad con lo anterior, varias compañías –entre ellas Caribbean Communications Solutions, Inc. (Caribbean Communications); Guardian Electronic Security Services, Inc. (Guardian); y Telefónica Larga Distancia de Puerto Rico, Inc. h/n/c

Telefónica Empresas (Telefónica)- sometieron una serie de preguntas sobre los requisitos del RFP. En respuesta a sus inquietudes, la Policía emitió un aviso titulado "Respuestas a Preguntas" en el cual aclaró de forma específica cada una de las dudas presentadas por todos los posibles postores. Dicho documento refleja que las preguntas formuladas iban dirigidas a que la agencia aclarara qué equipo era aceptable para cumplir con determinados requerimientos técnicos del RFP.

Posteriormente, la Policía emitió otro documento de aclaración similar al anterior, en el cual atendió las inquietudes adicionales sometidas por los posibles licitadores y reiteró el método pautado para incluir los costos de las líneas de comunicación en la tabla de precios. A la luz de las preguntas sometidas por las compañías y las respuestas y aclaraciones provistas por la Policía, la agencia realizó dos enmiendas adicionales al RFP. En una de ellas se aclaró la aceptación de la Policía de ciertas variaciones en algunos de los equipos incluidos en las especificaciones, mientras que la otra consistió en adjuntar una tabla de precios enmendada.

Llegado el día señalado para el acto de apertura de la subasta, comparecieron como licitadoras varias entidades con sus ofertas, a saber: Alfa y Omega, S.E.; Bonneville Construction, S.E.; Caribbean Communications; Caribbean Data Systems, Inc.; Guardian y Telefónica. Los costos cotizados por cada una de dichas licitadoras fueron los siguientes:

Alfa y Omega, S.E.                                    $5,915,580.42

Bonneville Construction, S.E.        $6,923,240.57

Caribbean Communications           $6,412,210.00

Caribbean Data Systems, Inc.       $6,012,277.00

Guardian                           $3,959,124.29

Telefónica                         $4,905,427.18

Recibidas las propuestas, el Director del Negociado de Tecnología constituyó un Equipo Evaluador, organismo que evaluaría las ofertas presentadas en varias etapas y posteriormente rendiría un Informe Técnico en el cual le haría sus recomendaciones a la Junta de Subastas de la Policía. De otra parte, se les concedió a las licitadoras la oportunidad de someter comentarios escritos sobre las ofertas de sus competidoras.

Conforme a lo anterior, la primera fase de consideración de las propuestas por el Equipo Evaluador consistió en hacer una inspección inicial de las mismas, con el propósito de determinar si cumplían con las especificaciones técnicas del RFP. En esta etapa, el Equipo Evaluador identificó varios aspectos en las propuestas que debían aclararse, por lo que determinó celebrar reuniones individuales con el equipo de trabajo de cada licitador para así llegar a conclusiones objetivas.[2] Dichas reuniones sólo iban dirigidas a que las

---

[2] Así se desprende del Informe Técnico realizo por el Equipo Evaluador, el cual consta en el expediente ante nuestra consideración:

[S]e identificaron y documentaron todos aquellos puntos donde existían dudas razonables y/o aquellos asuntos donde había desviaciones a lo pautado en las especificaciones técnicas. Como entendíamos que cada propuesta sería responsiba [sic] tratamos de aclarar estas desviaciones

licitadoras aclararan desviaciones encontradas en las ofertas, mas no generaron modificación alguna en éstas. Es importante destacar que el expediente ante nuestra consideración refleja que el Equipo Evaluador incluyó, como parte del referido Informe Técnico, una relación detallada de los trámites llevados a cabo en cada una de las reuniones.

Durante la segunda fase de evaluación, el Equipo Evaluador analizó las críticas presentadas por las licitadoras sobre las propuestas de sus competidoras. A esos efectos, atendió de forma específica todos los señalamientos, incluyendo los de Caribbean Communications, quien había cursado una comunicación escrita a la Junta de Subastas mediante la cual expuso que era la única postora que cumplía a cabalidad con el RFP. Mediante la referida comunicación, Caribbean Communications argumentó cuáles, a su juicio, eran las deficiencias de las propuestas formuladas por cada una de las proponentes. Respecto a Telefónica, Caribbean Communications señaló que la programación que dicha compañía incluyó en su propuesta incumplía con lo requerido en el RFP. Sin embargo, el Equipo Evaluador rechazó los argumentos de Caribbean Communications, a la luz de sus propios hallazgos. Según surge del expediente ante nos, el Equipo Evaluador realizó dicha tarea de forma detallada, comparando cada uno de los

aplicando [un] análisis más exhaustivo. Muchas contestaciones afloraron como parte de esta etapa. Sin embargo, para ser objetivos, entendimos necesario convocar a reunión a cada equipo de trabajo de cada licitador para poder llegar a conclusiones.

señalamientos con los resultados de su propio análisis de las propuestas.

Como parte de la etapa de evaluación final, el Equipo Evaluador diseñó una Tabla de Cumplimiento General, donde identificó las propuestas de cada proponente y determinó si cumplían con los requisitos generales del RFP, principalmente con el requisito de someter la documentación técnica de los equipos y programas ofertados. Telefónica y Caribbean Data Systems recibieron la puntuación más alta en dicha tabla. Luego, el Equipo Evaluador rindió su Informe Técnico, en el cual recomendó adjudicar la buena pro de la subasta a Telefónica, por ser ésta quien presentó la oferta más económica que cumplió con los requisitos y condiciones establecidos.

Según revela dicho informe, el Equipo Evaluador determinó que Caribbean Data Systems y Telefónica fueron las únicas licitadoras que cumplieron con todas las especificaciones. En lo pertinente al caso de autos, el Equipo Evaluador determinó que Caribbean Communications incumplió con siete especificaciones, mientras que Guardian, quien presentó la oferta más económica, incumplió con cuatro. La evaluación reflejó que Guardian y Caribbean Communications ocuparon, respectivamente, el cuarto y quinto lugar en orden de cumplimiento. En cuanto al orden de costos, Guardian ocupó el primer lugar, Telefónica el segundo y Caribbean Communications el quinto. Cabe señalar que esta última licitadora presentó una segunda comunicación escrita en la

cual reiteró sus críticas a la programación propuesta en la oferta de Telefónica.

Luego de constituirse durante varios días para evaluar las propuestas y el Informe Técnico, la Junta de Subastas adjudicó la buena pro a Telefónica. La Junta determinó que la oferta de dicha licitadora cumplió con las especificaciones, condiciones y precio, y fue la "más conveniente a los intereses de la agencia en cuanto a la tecnología y el equipo propuesto". Dado que la subasta involucraba una cantidad sustancial de aspectos muy técnicos, la Junta hizo constar que adoptaba la evaluación de sus asesores, a saber, un Especialista en Sistemas de Información y un Programador de Sistemas, quienes eran miembros del Equipo Evaluador. El acta de adjudicación de la subasta refleja que la Junta de Subastas rechazó las propuestas de Caribbean Communications y Guardian por entender que ambas incumplieron con varias especificaciones del pliego de subasta.[3]

---

[3] Específicamente, la Junta determinó que la propuesta de Caribbean Communications adoleció de los siguientes defectos: (1) no se mencionó que el *Server Rack Device* propuesto tuviera los dos abanicos requeridos; (2) el *SAN Storage Volume* propuesto ofreció 4GB y el RFP requería 8GB; (3) las cámaras PTZ ofrecieron 8 zonas programables de privacidad y el RFP requería 15; (4) la capacidad de la comunicación *wireless* ofrecida es de 48 Mbps y se requerían 100Mbps; (5) no se sometió la literatura del producto Flat LCD; y (6) el precio es $1,506,782.82 más alto que el de Telefónica.

En cuanto a Guardian, la Junta rechazó su propuesta bajo los siguientes fundamentos: (1) respecto a los requisitos de seguridad, ofreció un *software server based firewall* en vez del *hardware based firewall* requerido; (2) el *software* propuesto no cumplió con el *Intrusion Prevention and Reporting System*; (3) cotizó un modelo de SAN y presentó literatura de otro; y (4) no presentó evidencia de que su

Inconformes con la determinación de la Junta de Subastas, Caribbean Communications y Guardian presentaron sendas mociones de reconsideración ante la Junta de Reconsideración de la Administración de Servicios Generales. En su moción, Caribbean Communications alegó que la Policía erró al adjudicar la subasta de forma contraria a las condiciones y requisitos estipulados y al determinar que dicha compañía había incumplido con éstos. En apoyo de su moción de reconsideración, Caribbean Communications presentó –por primera vez– un informe preparado por una entidad llamada NetVideo Consulting, Inc., en el cual se detallan alegadas deficiencias de la programación ofrecida por Telefónica. Por su parte, Guardian sostuvo que fue el único licitador que cumplió con todas las especificaciones y cotizó el precio más económico, y que la propuesta de Telefónica no cumplió con el RFP. En la alternativa, alegó que la Junta de Subastas debió emitir una notificación de rechazo global y celebrar una nueva subasta, dado que ninguno de los licitadores cumplió con el RFP. Sin embargo, la Junta de Reconsideración no tomó determinación alguna respecto a las mociones, por lo que éstas se entendieron rechazadas de plano.

---

subcontratista estuviese registrado en el Registro Único de Licitadores de la Administración de Servicios Generales. Cabe señalar que la Junta hizo constar que Guardian envió una comunicación en una fecha posterior al acto de apertura de la subasta, mediante la cual confirmó su intención de ofrecer un modelo de SAN distinto al cotizado. La Junta determinó que ello era "inaceptable y modifica[ba] su oferta".

Insatisfechas, Caribbean Communications y Guardian acudieron oportunamente al Tribunal de Apelaciones y, en esencia, reprodujeron los mismos señalamientos de error esbozados ante la Junta de Reconsideración. Cabe señalar que Caribbean Communications solicitó al foro apelativo la paralización de los procedimientos ante la Junta de Subastas de la Policía, pero dicho tribunal no accedió a su petición. Por ello, durante la pendencia del recurso de revisión administrativa ante el Tribunal de Apelaciones, la Policía y la Telefónica procedieron a perfeccionar el contrato para el sistema de vigilancia inteligente y el desarrollo del proyecto siguió su curso normal.

Luego de los trámites de rigor, los que incluyeron la consolidación de los recursos de revisión, el Tribunal de Apelaciones emitió una extensa Resolución mediante la cual paralizó los procedimientos administrativos y devolvió el asunto a la Junta de Reconsideración para que dicho organismo celebrara una vista evidenciaria, reconsiderara la adjudicación de la subasta y emitiera una resolución fundamentada que incluyera determinaciones de hecho y conclusiones de derecho. El tribunal retuvo jurisdicción sobre el asunto, por lo que ordenó que la referida resolución en reconsideración le fuera notificada, luego de lo cual las partes tendrían un término de treinta días para someter un escrito ante el foro apelativo.

A juicio del foro apelativo, dada la naturaleza altamente técnica y compleja de las especificaciones de la subasta, el mecanismo apropiado para adjudicar la misma era uno informal

de requerimiento de propuestas o RFP, el cual el tribunal entendió había sido utilizado por la Policía. Aunque, como indicamos, el tribunal apelativo devolvió el asunto a la Junta de Reconsideración para que atendiera las mociones de reconsideración de Caribbean Communications y Guardian y emitiera una resolución fundamentada, dicho foro proveyó al organismo admnistrativo ciertas "sugerencias", a modo de "apéndice técnico". En lo pertinente al caso de autos, el Tribunal de Apelaciones determinó que el mecanismo de RFP permite llevar a cabo negociaciones con cada licitador para remediar deficiencias en sus propuestas, factor que la Junta de Reconsideración debía considerar.

Asimismo, el Tribunal de Apelaciones entró en los méritos de la adjudicación de la subasta. En este sentido, el análisis del foro apelativo se centró en dos asuntos principales, a saber: si el método que utilizó la Junta de Subastas para comparar el costo de las ofertas fue racional, y si la programación que ofreció Telefónica en su propuesta cumple con las especificaciones del RFP. El tribunal contestó ambas interrogantes en la negativa. Como cuestión preliminar, aclaró que en la propuesta de Caribbean Communications debía subsanarse un error aritmético y que a dicha propuesta, así como a la de Guardian, debían restárseles las partidas relativas al impuesto sobre ventas y uso (IVU) dado que Telefónica no las incluyó en su oferta.[4]

---

[4] El error aritmético en la propuesta de Caribbean Communications consistió en que se cotizaron $584,050 en exceso. Respecto a las partidas por concepto de IVU,

Luego de lo anterior, el tribunal resolvió que la Junta de Subastas erró al sólo considerar como precio unitario de las líneas de transmisión de datos el costo de alquiler de un mes, pues las cifras no representaban de forma racional los recursos financieros que requería el proyecto. Según el foro apelativo, lo correcto era tomar en cuenta un estimado del ciclo de vida útil del proyecto, el cual debía ser determinado por un foro que recibiera evidencia pericial a tales efectos. Sin embargo, el tribunal procedió a hacer un cálculo de los costos totales de las ofertas, a la luz de los ajustes mencionados y tomando veinticuatro meses como la vida útil del proyecto. A raíz de dichos cálculos, el tribunal determinó que la propuesta de Telefónica era la más costosa. Concluyó que la determinación de la Junta de Subastas no le merecía deferencia, pues, a su juicio, la Policía no posee peritaje particular en la evaluación de proyectos de inversión capital.

Por otra parte, en lo concerniente a la programación ofrecida por Telefónica, el Tribunal de Apelaciones sostuvo que del expediente no surge evidencia que demuestre que la Junta de Subastas realizó una evaluación realista de ésta. Como fundamento para su conclusión, el tribunal utilizó la Tabla de Cumplimiento General preparada por el Equipo Evaluador para inferir que la agencia sólo había evaluado si el licitador incluyó la literatura de los productos ofrecidos. Asimismo, el tribunal le concedió credibilidad al

---

Caribbean Communications incluyó una cantidad de $419,490 en su propuesta, mientras que Guardian incluyó $245,124.02.

informe preparado por NetVideo Consulting Inc. que Caribbean Communications presentó luego de adjudicada la subasta, por entender que el mismo tenía un valor persuasivo sustancial, ya que había sido preparado por una parte sin interés que posee peritaje especializado en el área de programación. Tras hacer una analogía con la Regla 49.2 de Pocedimiento Civil, 32 L.P.R.A. Ap. III, el foro apelativo consideró que la presentación de dicho informe no fue tardía, pues éste se publicó luego de la adjudicación de la subasta. Por último, el tribunal se negó a conceder deferencia a las determinaciones de la Policía, pues a su entender dicha agencia no posee peritaje en la evaluación de este tipo de programación.[5]

Inconformes, Telefónica y la Policía, representada por el Procurador General, acudieron ante nos mediante sus respectivas peticiones de *certiorari*. Ambas peticionarias alegan que el Tribunal de Apelaciones erró al no otorgar deferencia a la determinación de la Junta de Subastas; al considerar como parte del expediente evidencia que no fue presentada durante el proceso de la adjudicación de la subasta; y al conceder un remedio incompatible con la naturaleza informal de los procedimientos de adjudicación de subastas. En cuanto al mecanismo de subasta empleado por la Policía, el Procurador sostiene que se trató de un procedimiento *sui generis*, que incorporó algunos elementos

---

[5] Cabe señalar que el Juez José L. Miranda De Hostos emitió un voto disidente por entender que la Resolución emitida es contraria a la norma que otorga deferencia a las agencias administrativas.

propios de una subasta informal o RFP, pero que cumplió estrictamente con el proceso formal contemplado por el Reglamento para la Adquisición y Venta de Bienes y Servicios de la Comisión de Seguridad y Protección Pública, Reglamento Núm. 5850 de 27 de septiembre de 1998. Específicamente, argumenta que aunque se siguió el procedimiento establecido en dicho reglamento, se les concedió a las licitadoras más oportunidades de participación que las que se conceden en subastas formales.

Examinadas ambas peticiones, mediante Resolución emitida el 21 de noviembre de 2007, expedimos el auto, consolidamos los recursos y, en auxilio de nuestra jurisdicción, dejamos sin efecto la paralización de los procedimientos administrativos ordenada por el Tribunal de Apelaciones. Con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

**II**

**A**

Como es sabido, en nuestra jurisdicción no existe legislación especial que regule los procedimientos de subasta dirigidos a la adquisición de bienes y servicios para las entidades gubernamentales. De hecho, la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) excluyó expresamente las subastas de los procedimientos adjudicativos formales regulados en dicha ley y dispuso que éstas se considerarán informales no cuasijudiciales. 3 L.P.R.A. secs. 2151, 2169. Con excepción de las etapas de reconsideración y revisión judicial, que son objeto de regulación particular en la

L.P.A.U., las agencias gubernamentales son las llamadas a adoptar las normas a seguir en sus propios procedimientos de adjudicación de subastas. 3 L.P.R.A. secs. 2169, 2172; Perfect Cleaning v. Centro Cardiovascular, 162 D.P.R. 745, 757 (2004).

Ahora bien, dado que la adjudicación de las subastas gubernamentales conlleva el desembolso de fondos del erario, dichos procedimientos están revestidos de un gran interés público y aspiran a promover una sana administración pública. Marina Costa Azul v. Comisión, res. el 27 de abril de 2007, 2007 TSPR 78; A.E.E. v. Maxon, 163 D.P.R. 434, 438-39 (2004). Por ello, "la consideración primordial al momento de determinar quién debe resultar favorecido en el proceso de adjudicación de subastas debe ser el interés público en proteger los fondos del pueblo de Puerto Rico". Cordero Vélez v. Municipio de Guánica, res. el 12 de febrero de 2007, 2007 TSPR 24.

En atención a lo anterior, hemos resuelto que la normativa que regula las subastas en nuestra jurisdicción busca proteger los intereses del pueblo, procurando conseguir los precios más económicos; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos; y minimizar los riesgos de incumplimiento. Empresas Toledo v. Junta de Subastas, 168 D.P.R. 771, 778 (2006). Para posibilitar estos objetivos y asegurar que la adquisición de bienes por el Gobierno se lleve a cabo con transparencia, eficiencia y probidad, se fomenta la libre competencia entre el mayor número posible de

postores. *Id.*; Accumail v. Junta de Subastas, res. el 12 de abril de 2007, 2007 TSPR 70; A.E.E. v. Maxon, *supra*, pág. 439.

La subasta pública formal o mediante ofertas selladas constituye el procedimiento que más comúnmente utilizan las entidades gubernamentales para la adquisición de bienes y servicios. R&B Power v. E.L.A., res. el 20 de marzo de 2007, 2007 TSPR 51. La subasta formal comienza cuando la agencia prepara los pliegos de condiciones y especificaciones y emite una invitación o un aviso de subasta al público. Luego de ello, los interesados someten sus propuestas selladas, las cuales se hacen públicas mediante la celebración del acto de apertura ante todos los postores. Posteriormente, las propuestas pasan a un comité evaluador, el cual las evalúa y emite una recomendación respecto a la adjudicación de la buena pro. Recibida dicha recomendación, el procedimiento concluye con la adjudicación de la buena pro por la agencia y la notificación de la misma a todos los postores. R&B Power v. E.L.A., *supra*.

La particularidad del procedimiento de subasta formal reside en que las ofertas se presentan selladas. Ello es de suma importancia, pues garantiza la secretividad en la etapa anterior a la apertura de la licitación. Este elemento es indispensable para que exista una competencia leal y honesta, pues impide que un postor enmiende su propuesta para superar la de un competidor. Trans Ad de P.R. v. Junta de Subastas, res. el 24 de junio de 2008, 2008 TSPR 110; RBR Construction v. Autoridad de Carreteras, 149 D.P.R. 836, 849 (1999). Una

vez se celebra el acto de apertura, todos los licitadores conocen las ofertas de sus competidores, razón por la cual en esta etapa no se admiten modificaciones a las propuestas y sus términos se entienden finales. R&B Power v. E.L.A., *supra*; véase Justiniano v. E.L.A., 100 D.P.R. 334, 340 (1971).

No obstante, la formalidad y secretividad que caracteriza a la subasta tradicional no impide que durante la etapa previa a la entrega de las ofertas la agencia adopte mecanismos con miras a garantizar que la presentación de dichas ofertas se haga de forma efectiva, con un adecuado entendimiento por parte de los posibles licitadores sobre los requerimientos y condiciones establecidos en los pliegos de la subasta y las necesidades de la agencia. En este sentido, además de la información y las instrucciones establecidas en la invitación a la subasta, el procedimiento de subasta formal puede incluir, entre otros: aclaraciones por parte de la agencia de cualquier ambigüedad en las especificaciones o dudas que surjan sobre éstas; la celebración de reuniones pre-subasta; inspecciones en el lugar donde se implantará el producto o material; y el suministro de modelos o muestras que posea la agencia y que pueda asistir al posible licitador a entender las especificaciones. S.W. Feldman, Government Contract Guidebook, 4ta ed., Thomson West, 2008, sec. 5:10, pág. 115. Medidas como las mencionadas posibilitan la entrega de ofertas responsivas y, por lo tanto, contribuyen a que la agencia obtenga bienes o servicios que se ajusten a sus requerimientos o necesidades.

Por otro lado, aunque la subasta formal es el método tradicional que se utiliza para la adquisición de bienes y servicios en el Gobierno, los reglamentos que regulan estos procedimientos contienen, de ordinario, disposiciones que le permiten a la agencia prescindir del procedimiento formal en casos excepcionales. Ello ocurre, por ejemplo, en situaciones de emergencia que requieren la pronta adquisición de un material o equipo, cuando se trata de adquirir piezas de repuesto para bienes previamente subastados, cuando haya un solo suplidor para el bien en cuestión, entre otros. R&B Power v. E.L.A., *supra*; véanse Trans Ad de P.R. v. Junta de Subastas, *supra*; Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 876-77 (1990). En tales casos, la agencia puede adquirir el bien o servicio mediante la celebración de un procedimiento informal, si así lo autoriza su ley orgánica o su reglamento. *Id.*

Recientemente, en R&B Power v. E.L.A., *supra*, reconocimos la validez del requerimiento de propuestas, o RFP, como mecanismo informal para la adquisición de bienes y servicios por el Gobierno. En comparación con las subastas formales, el requerimiento de propuestas se distingue por ser un procedimiento más flexible, por lo que resulta práctico cuando la subasta persigue la adquisición de bienes o servicios especializados que involucran asuntos técnicos o muy complejos o cuando existen pocos competidores cualificados. *Id.* Los requisitos a considerar en la adjudicación del contrato se enumeran en el RFP, el cual incluye, entre otros, el valor que se le asigne a éstos, el

itinerario para recibir y evaluar las propuestas y adjudicar
la buena pro, así como los términos del contrato. *Id.* Estos
asuntos pueden discutirse durante la celebración de reuniones
pre-propuestas, de forma tal que se logre un mejor
entendimiento sobre los requisitos y condiciones del RFP.
S.W. Feldman, *supra*, sec. 6:14, pág. 157.

La característica principal del RFP es que permite
entablar negociaciones entre los licitadores y el Gobierno
durante la evaluación de las propuestas recibidas. Es decir,
a diferencia del procedimiento formal de subasta -donde no
hay cabida para la negociación de los términos de las
ofertas- el RFP es un mecanismo que admite la compra
negociada y, por lo tanto, confiere a los licitadores la
oportunidad de revisar y modificar sus ofertas antes de la
adjudicación de la buena pro. Ello suele surgir del propio
requerimiento de propuestas. R&B Power v. E.L.A., *supra*.

El factor central para determinar si en efecto hubo una
negociación en un procedimiento de subasta mediante RFP es si
se le concedió al licitador la oportunidad de revisar y
modificar su propuesta. J.C. McBride y T. Touhey, Government
Contracts: Cyclopedic Guide to Law, Administration,
Procedure, LexisNexis, 2008, Vol. 1B, pág. 9-81. Si dicha
oportunidad no fue concedida, se entiende que la comunicación
entre la agencia y el licitador constituye una aclaración.
*Id.* Por ello, la conducta de las partes es el factor central
para determinar si medió una negociación, no la etiqueta que
emplee la agencia para describir dicha comunicación. S.W.
Feldman, *supra*, sec. 6:18, pág. 161.

Las aclaraciones se logran mediante explicaciones o corroboraciones realizadas en respuesta a preguntas hechas por la agencia o por el licitador. A diferencia de las negociaciones, las aclaraciones sólo ofrecen a los licitadores la oportunidad de aclarar ciertos aspectos sobre sus propuestas –lo que puede incluir el proveer información adicional a la agencia–, por lo que no conllevan modificaciones en éstas. Information Technology v. United States, 316 F.3d 1312, 1322-23 (Cir. Fed. 2003); S.W. Feldman, *supra*, sec. 6:16, pág. 159. También constituyen un mecanismo apropiado para corregir errores menores u oficinescos en las propuestas. *Id*.

Aunque el procedimiento de subasta formal y el RFP son distintos, no son totalmente incompatibles entre sí. Anteriormente hemos resuelto que el RFP, por ser un mecanismo alterno al procedimiento tradicional, necesariamente participa de alguna de las características de la subasta formal. Específicamente, al igual que la subasta formal, el RFP, está sujeto a los requisitos de notificación que establece la L.P.A.U., así como a los procedimientos de reconsideración y revisión judicial contenidos en dicho estatuto. R&B Power v. E.L.A., *supra*. Más importante aún, las adquisiciones de bienes o servicios que realice el Gobierno mediante RFP están, como toda subasta gubernamental, revestidas de un gran interés público en la protección del erario y en garantizar que dichas adquisiciones se lleven a cabo con transparencia, eficiencia y probidad.

**B**

De conformidad con los preceptos de la L.P.A.U. en materia de subastas, la Comisión de Seguridad y Protección Pública promulgó el Reglamento para la Adquisición y Venta de Bienes y Servicios, *supra*, el cual establece los criterios para seleccionar el método de subasta a emplearse durante la adquisición de bienes y servicios por la Policía. El referido reglamento exime a la Policía de celebrar una subasta formal en aquellos casos en que la adquisición conlleve un costo de $25,000 o menos. Art. 11, inciso A, Reglamento Núm. 5850, *supra*. De ser así, se puede celebrar una subasta informal mediante solicitud de cotizaciones que incluyan las especificaciones y condiciones solicitadas y el término para presentar las ofertas. Recibidas las ofertas, la agencia adjudicará la subasta a favor del licitador cuya propuesta cumpla con las especificaciones, condiciones y términos solicitados, siempre que ésta constituya una fuente segura de abastos, y procederá a notificar dicha adjudicación. *Id*.

De otra parte, el reglamento dispone que si la transacción excede $25,000 se debe celebrar una subasta formal. Art. 11, inciso C, Reglamento Núm. 5850, *supra*. En estos casos, el pliego de subasta debe contener el aviso, las instrucciones, las especificaciones y las condiciones establecidas para la subasta. *Id*. Una vez se prepara el pliego de subasta, la agencia realiza una convocatoria mediante una publicación en un periódico o por invitación. La convocatoria debe informarles a los participantes la fecha en que se hace la

misma, el número de subasta, las condiciones y los requisitos que deben reunir los licitadores, la fecha, el lugar y la hora para presentar las ofertas y para el acto de apertura, entre otros. Art. 15, Reglamento Núm. 5850, *supra*.

El reglamento establece como requisito obligatorio que las ofertas se presenten en sobres cerrados, los cuales "no se abrirán bajo ninguna circunstancia" hasta el acto de apertura. Art. 17, inciso A, Reglamento Núm. 5850, *supra*. Recibidas las ofertas, se permiten modificaciones a las mismas. Sin embargo, el reglamento dispone expresamente que dichas enmiendas tienen que hacerse *antes de la apertura de la subasta*. Art. 17, inciso C, Reglamento Núm. 5850, *supra*. Si se trata de un error en la suma de las partidas, el mismo no se debe tomar en cuenta, pues se deben considerar, por separado, las cifras correspondientes a dichas partidas. *Id*.

Celebrado el acto de apertura, la Junta de Subastas debe constituirse para adjudicar la buena pro. Durante dicha reunión, puede estar presente cualquier perito que haya participado en la evaluación de la subasta o a quien la Junta le haya solicitado asesoramiento. Art. 19, inciso B, Reglamento Núm. 5850, *supra*. El reglamento establece que la adjudicación se debe hacer a favor del licitador cuya oferta cumpla con las especificaciones, las condiciones y los requisitos en el pliego de la subasta, y que sea la más baja en precio. Art. 19, inciso F, Reglamento Núm. 5850, *supra*. Sin embargo, en cuanto al factor de precio, el reglamento dispone que éste no es determinante si luego de evaluadas las propuestas "una de mayor valor resulta más beneficiosa y

conveniente a los intereses de [la agencia], por ser el producto más duradero, resistente, de mayor calidad y porque tiene todos los atributos necesarios para el fin [al] que ha de ser destinado". Art. 13, inciso C, Reglamento 5850, *supra*.

### III

En el caso de autos, la Policía emitió una Invitación a Subasta Formal, recibió ofertas selladas, celebró un acto de apertura, llevó a cabo la evaluación y estudio de las ofertas y, tras la recomendación de un comité evaluador, adjudicó la buena pro y notificó a los licitadores. No cabe duda, por tanto, de que el procedimiento de subasta en controversia cumplió con los requisitos establecidos en el referido reglamento para una subasta formal, que era el procedimiento requerido pues el costo de la subasta era mayor de $25,000. Art. 11, inciso C, Reglamento Núm. 5850, *supra*.

Por otro lado, en la etapa anterior al acto de apertura, se les concedió a los posibles licitadores la oportunidad de someter sus preguntas sobre los requisitos y condiciones de la subasta y obtener respuestas de la agencia. Se trata de un mecanismo que se llevó a cabo para que la agencia realizara aclaraciones sobre las especificaciones contenidas en los pliegos o contestara las dudas sobre éstos. Como hemos indicado, ello es un mecanismo permitido en las subastas formales que garantiza que la presentación de las propuestas sea efectiva y posibilita la entrega de ofertas responsivas. S.W. Feldman, *supra*, sec. 5:10, pág. 115.

En el presente caso, la Policía emitió un aviso titulado "Respuestas a Preguntas" y otro documento similar mediante

los cuales aclaró de manera específica cada una de las preguntas presentadas por los posibles licitadores. Siendo ello así, el mecanismo de preguntas y respuestas colocó a los participantes en igualdad de condiciones para competir en la adjudicación de la buena pro, pues a todos se les divulgó las contestaciones a las preguntas. Ciertamente, ello evitó que alguna licitadora obtuviera ventaja sobre otra, lo que es cónsono con el principio de libre competencia.

De igual forma, un proceso de preguntas y respuestas como el que se llevó a cabo en el caso de autos le confiere a la agencia la oportunidad de considerar si acepta variaciones en los equipos o servicios contemplados originalmente por ésta, lo que le ofrece elementos adicionales para decidir qué producto o servicio se ajusta mejor a sus necesidades y si, por lo tanto, procede enmendar lo requerido originalmente en el RFP. Precisamente, eso fue lo que ocurrió en el presente caso, pues la Policía realizó dos enmiendas al RFP en atención a las preguntas sometidas por las licitadoras y las respuestas provistas a éstas.[6]

Ahora bien, el procedimiento de subasta celebrado por la Policía involucró ciertas particularidades que se apartan de una subasta formal en su sentido estricto. En primer lugar, dada la complejidad técnica que supone el diseño e implantación de un sistema de vigilancia inteligente, las condiciones y especificaciones de la subasta se desglosaron en un documento titulado "Request for Proposal (RFP)" que

_____

[6] En el caso de autos, no está en controversia la facultad de la Policía para enmendar los pliegos de la subasta. Véase, Art. 16, inciso A, Reglamento Núm. 5850, *supra*.

acompañó la invitación a subasta y, en efecto, a tono con dicho mecanismo, la Policía requirió que se sometieran propuestas. Celebrado el acto de apertura, como parte de la evaluación de las propuestas, la agencia sostuvo reuniones individuales con cada uno de los proponentes con el propósito de aclarar los términos de las ofertas presentadas. Asimismo, permitió que las licitadoras sometieran sus críticas a las ofertas de sus competidoras y ofreció sus propios hallazgos al respecto como parte del Informe Técnico.

A pesar de que estas particularidades guardan cierta similitud con la flexibilidad que caracteriza a las subastas informales, somos del criterio que las mismas no convirtieron el procedimiento en uno de RFP o compra negociada. De entrada, aunque la agencia empleó un RFP en sustitución de los pliegos de subasta, lo cierto es que el procedimiento cumplió con todos los requisitos de una subasta formal. La denominación de la subasta como un RFP y el subsiguiente requerimiento de propuestas no es impedimento para que consideremos la subasta como una formal, siempre que se haya cumplido con los requisitos de dicho procedimiento. Trans Ad de P.R. v. Junta de Subastas, *supra*, págs. 7-8, n.4.[7]

Por otro lado, en el RFP en controversia se estableció que aunque la Policía podía solicitar discusiones orales con los licitadores si lo estimaba necesario, las propuestas se

---

[7] En Trans Ad de P.R. v. Junta de Subastas, *supra*, tuvimos ante nuestra consideración la impugnación de una subasta que la agencia tituló RFP, pero cumplió con todas las características de una subasta formal. Por ello, al atender la controversia en aquel caso, partimos de la premisa de que se trató en realidad de un procedimiento formal. Trans Ad de P.R. v. Junta de Subastas, *supra*, págs. 7-8, n.4.

considerarían finales y no podrían ser alteradas. Por ello, dado que no se les confirió a las licitadoras la oportunidad de revisar y modificar sus ofertas luego de celebrado el acto de apertura, resulta forzoso concluir que las reuniones celebradas entre la Policía y las postoras no constituyeron negociaciones. *Information Technology v. United States*, *supra*; J.C. McBride y T. Touhey, *supra*.

Más bien, el procedimiento de subasta ante nuestra consideración constituyó un procedimiento formal híbrido que incorporó –mediante las reuniones individuales con las licitadoras– el mecanismo de aclaraciones propio de un RFP y que confirió –a través de la oportunidad concedida a las licitadoras para comentar las ofertas de sus competidoras– más oportunidades de participación a éstas que las que de ordinario tendrían en un procedimiento formal. Surge, por tanto, la interrogante de si dicho procedimiento híbrido es válido a la luz del interés público en la protección del erario y la sana administración pública que persigue todo procedimiento de subasta.[8] Varias razones nos llevan a concluir en la afirmativa.

---

[8] Adviértase que los procedimientos híbridos no son extraños en el campo de las subastas formales. Existe, por ejemplo, el mecanismo híbrido de dos pasos ("Two-Step Sealed Bidding") que combina elementos del procedimiento de RFP con la subasta formal. Mediante el primer paso, la agencia emite requerimientos de propuestas técnicas, las cuales se evalúan sin tomar en cuenta el factor de precio. Una vez la agencia examina dichas propuestas y determina cuáles licitadoras presentaron propuestas aceptables, se procede al segundo paso, que consiste en invitar a las licitadoras que fueron exitosas en el primer paso a someter propuestas selladas. S.W. Feldman, *supra*, secs. 5:40-5:42, págs. 142-43; J.C. McBride y T. Touhey, *supra*, sec. 10.30, págs. 10-99--10-100.

En primer lugar, las reuniones celebradas con las licitadoras luego del acto de apertura constituyen una herramienta de aclaración beneficiosa para todas las partes durante el proceso de evaluación. En las referidas reuniones la agencia tiene la oportunidad de aclarar sus dudas sobre las ofertas presentadas o las desviaciones halladas en éstas. En ese sentido, dichas reuniones contribuyen a que la agencia tome una decisión más informada y objetiva, lo que evita que ésta elimine una propuesta por entender, erróneamente, que la misma no es responsiva. Ello garantiza, a su vez, que el proceso de evaluación de las propuestas sea justo y equitativo para todas las licitadoras.

Asimismo, proveerle a las licitadoras la oportunidad de someter comentarios escritos sobre las ofertas de sus competidoras viabiliza los principios de transparencia y libre competencia que deben regir en toda subasta, pues permite a las participantes expresar sus criterios sobre en qué medida los productos o servicios ofertados por sus contrincantes se apartan de los requisitos esbozados por la agencia. El análisis posterior que provee la agencia respecto a dichos comentarios –en unión a sus propios hallazgos– propende a evitar el favoritismo y el fraude en la adjudicación de la buena pro, en tanto refleja que la agencia ha considerado no sólo el criterio propio, sino también el de los participantes, por lo que su decisión ha sido razonada.

Los mecanismos de aclaración y participación como los reseñados cobran mayor importancia cuando se trata de subastas que involucran la adquisición de bienes y servicios

sofisticados que, en consecuencia, implican la evaluación de ofertas sumamente complejas o de alto contenido técnico, como ocurre en el caso de autos. De hecho, los referidos mecanismos no sólo benefician a las licitadoras, sino también a la agencia, pues facilitan el proceso de obtención de productos y servicios de calidad que se ajusten a sus necesidades.

Más importante aún, dichos mecanismos no atentan contra el principio de secretividad que caracteriza las etapas anteriores a la celebración del acto de apertura. Una vez conocidas las ofertas, las reuniones celebradas por la agencia y los comentarios escritos de las licitadoras no redundan en cambios o modificaciones a las propuestas presentadas. Ello impide que algún postor de mayor capacidad económica logre obtener ventaja sobre otro al efectuar cambios a su propuesta tras conocer lo ofertado por sus competidores. De esta manera, se fomenta la competencia efectiva y honesta que debe permear en todo procedimiento de subasta. Trans Ad de P.R. v. Junta de Subastas, *supra*.

Recientemente, en Accumail v. Junta de Subastas, *supra*, tuvimos la oportunidad de evaluar la validez de una "aclaración" realizada por una de las licitadoras luego del acto de apertura, a la luz de los principios de secretividad y libre competencia. Se trató allí de una llamada telefónica mediante la cual la postora quiso aclarar cuál era el precio cotizado a pesar de que inicialmente su propuesta no había sido responsiva en cuanto a ese aspecto, por no incluir la información requerida en los pliegos. Como dicha aclaración

implicó una alteración a la propuesta luego de que la licitadora en cuestión tuviera la ventaja de conocer los precios ofrecidos por cada uno de los licitadores, resolvimos que la misma era inadmisible, pues lo contrario hubiera atentado contra la transparencia del proceso y la competencia honesta. Accumail v. Junta de Subastas, *supra*.

En sentido contrario, las aclaraciones involucradas en procedimientos de subasta híbridos como el de autos se realizaron por la propia agencia durante la etapa de evaluación de las propuestas con el propósito de aclarar las desviaciones que el comité evaluador halló en las mismas. Es decir, dichos procesos no condujeron a las discusiones o negociaciones propias de una compra negociada. Por consiguiente, resolvemos que el procedimiento de subasta en controversia es válido a la luz de los principios de transparencia, libre competencia y sana administración pública que rigen las subastas gubernamentales. El Tribunal de Apelaciones erró al resolver que la subasta se condujo mediante el proceso informal de RFP, conclusión que es contraria a los parámetros establecidos en el Reglamento Núm. 5850, *supra*, para la selección del procedimiento de subasta.

Ahora bien, debe quedar claro que el mecanismo híbrido que aquí avalamos no puede llevarse a cabo de espaldas al reglamento aplicable de la agencia ni, mucho menos, servir de subterfugio para soslayar los principios de transparencia y sana administración que rigen las subastas gubernamentales. Por ello, **de emplear el mecanismo de aclaración consistente en celebrar reuniones individuales con los licitadores luego**

**del acto de apertura de la subasta, la agencia deberá —como hizo la Policía en el presente caso— hacer constar por escrito y de forma detallada los procedimientos que se lleven a cabo en dichas reuniones, lo que se hará formar parte del expediente.** Sólo así se viabiliza una adecuada fiscalización de la utilización de los fondos del erario y una efectiva revisión de estos procedimientos de subasta por parte de los foros judiciales.

Aclarado lo anterior, evaluemos si la Policía erró al adjudicar la buena pro de la subasta a Telefónica.

### IV

Como es sabido, los procedimientos y las decisiones de las agencias administrativas están cobijados por una presunción de regularidad y corrección. Por ello, la revisión judicial de las determinaciones administrativas se limita a examinar si la actuación de la agencia fue razonable, y sólo cede cuando la decisión no está basada en evidencia sustancial, cuando la agencia ha errado en la aplicación de la ley o cuando su actuación es irrazonable o ilegal. Marina Costa Azul v. Comisión, *supra*; Otero v. Toyota, 163 D.P.R. 716, 729 (2005).

En el contexto de las subastas gubernamentales, la norma es que las agencias gozan de una amplia discreción en la evaluación de las propuestas sometidas ante su consideración. Accumail v. Junta de Subastas, *supra*. Ello responde a que, de ordinario, la agencia posee una vasta experiencia y especialización que la colocan en mejor posición que el foro judicial para seleccionar el postor que más convenga al

interés público. Perfect Cleaning v. Centro Cardiovascular, res. el 18 de septiembre de 2007, 2007 TSPR 167; Accumail v. Junta de Subastas, *supra*; Empresas Toledo v. Junta de Subastas, *supra*, pág.783; AEE v. Maxon, *supra*, pág. 444.

Adjudicada la buena pro, los tribunales no deben sustituir el criterio de la agencia o junta concernida, excepto si se demuestra que la decisión se tomó de forma arbitraria o caprichosa, o mediando fraude o mala fe. Torres v. Junta de Subastas, res. el 17 de enero de 2007, 2007 TSPR 7. En ausencia de estos elementos, "ningún postor tiene derecho a quejarse cuando otra proposición es elegida como la más ventajosa. La cuestión debe decidirse a la luz del interés público […]". *Id.*, citando a Great American Indemnity v. Gobierno de la Capital, 59 D.P.R. 911, 916 (1942). En tales casos, la determinación será sostenida si cumple con el criterio de razonabilidad. Accumail v. Junta de Subastas, *supra*.

De otra parte, aunque uno de los propósitos de las subastas es lograr que el Gobierno consiga los precios más bajos posibles, hemos resuelto que no existe una regla inflexible que exija adjudicar la subasta al postor más bajo. Torres v. Junta de Subastas, *supra*; Empresas Toledo v. Junta de Subastas, *supra,* pág. 779. Consideraciones de orden público como los servicios o productos técnicos, la probabilidad de realizar la obra de manera más eficiente y dentro del tiempo acordado, y los materiales, entre otros, que ofrezca un postor cuya propuesta no es la más económica pueden llevar a la agencia a seleccionarlo si ello

corresponde a sus mejores intereses. Empresas Toledo v. Junta de Subastas, *supra,* pág. 779. En este sentido, la agencia está facultada para rechazar la oferta más baja siempre que su determinación sea razonable. *Id.* Esta norma cobra importancia cuando se trata de la adquisición de bienes o servicios de alto contenido técnico y sofisticación, donde la decisión de la agencia no necesariamente descansa en criterios estrictamente matemáticos, sino en una valoración de la tecnología y recursos humanos ofrecidos, a la luz de las necesidades de la agencia. A.E.E. v. Maxon, *supra*, pág. 439.

En el caso de autos, la Policía adjudicó la buena pro de la subasta a favor de Telefónica, por entender que ésta presentó la oferta más económica que cumplió con los requisitos y condiciones establecidos. El Tribunal de Apelaciones revocó dicha determinación tras concluir que el método que empleó la Policía para evaluar los costos del proyecto, a saber, a base de una configuración típica de un sistema de vigilancia inteligente, no fue racional pues no representó de forma exacta los recursos financieros que la agencia necesitaría. El foro recurrido sostuvo que no procedía brindar deferencia a la determinación de la agencia, pues, a su juicio, ésta no posee peritaje particular en la evaluación de proyectos de inversión capital. Somos del criterio, sin embargo, que la actuación de la agencia fue razonable.

De entrada, la utilización de una configuración típica para la evaluación de los precios surge de la Sección 15 del

RFP. Asimismo, se estableció que las cantidades podrían variar de acuerdo con las necesidades de la agencia y la Policía reiteró en varias ocasiones el uso del costo de un mes de renta como precio unitario para las líneas de transmisión de datos. De esta forma, las licitadoras tenían conocimiento adecuado sobre los términos del método para comparar los costos de las ofertas.

En su alegato, el Procurador General explica que el referido método se empleó porque resultaba imposible para la agencia determinar de forma exacta las cantidades de los productos y los servicios requeridos ya que cada licitadora ofrecía equipo y programación distintos, lo que implicaba que las cantidades variarían dependiendo de lo ofertado, incluyendo las líneas de transmisión de datos. Por ello, aduce que el estándar de configuración típica y el parámetro del costo de un mes de renta por las referidas líneas fueron herramientas que se utilizaron para evaluar las ofertas de un modo más objetivo. Según el Procurador, exigir que la Policía determinara el número exacto de equipo hubiese requerido que la agencia divulgara información confidencial sobre cuáles eran las áreas de alta incidencia criminal y, a su vez, que la agencia acudiera físicamente a dichas áreas con cada uno de los licitadores para determinar la cantidad necesaria de cada producto para implantar el sistema de vigilancia en el lugar involucrado.

En vista de estos argumentos, no vemos cómo el método utilizado por la Policía perjudicó a las licitadoras o las colocó en desventaja respecto a sus competidoras. El

análisis en controversia tomó en cuenta que ninguna oferta sería idéntica a otra, por lo que la determinación de la Policía de utilizar criterios objetivos como lo son la configuración típica y el costo mensual de alquiler de las líneas fue razonable. De otra parte, lo contrario hubiera implicado exigirle a la agencia que divulgara información confidencial y que entablara un oneroso proceso para determinar, caso a caso, las cantidades necesarias de equipo respecto a cada licitador. Sin duda, ello es contrario a los intereses de la Policía como agencia encargada de prevenir, investigar y perseguir el delito, y a la informalidad que caracteriza los procedimientos de subasta en nuestra jurisdicción. 25 L.P.R.A. sec. 3102; 3 L.P.R.A. secs. 2151 y 2169.

Por otro lado, no debe perderse de vista que la subasta en controversia involucra elementos técnicos sumamente complejos y especializados, por lo que la agencia goza de discreción para basar su decisión sobre la adjudicación de la buena pro en criterios que no sean estrictamente matemáticos. A.E.E. v. Maxon, *supra*, pág. 439; véase además Art. 13, inciso C, Reglamento Núm. 5850, *supra*. Por ello, la determinación del foro apelativo a los efectos de que la oferta de Telefónica debió ser rechazada por ser la más costosa no puede sostenerse.

En primer lugar, considerar que la Policía debió usar un ciclo de vida útil del proyecto consistente en veinticuatro meses es una conclusión que no encuentra base alguna en el expediente, máxime cuando el foro judicial no posee la

pericia necesaria para definir lo que sería el ciclo de vida útil de un proyecto de gran envergadura y complejidad como lo es un sistema de vigilancia inteligente para todo el país. De otra parte, aun ajustando las propuestas de Caribbean Communications y Guardian para reducir las cantidades incluidas por concepto de IVU y corregir el error aritmético en la propuesta de la primera, la oferta de Telefónica aún sería la más económica que, según la agencia, cumplía con todos los requisitos y condiciones establecidos.[9]

Asimismo, no estamos en posición para sustituir el criterio de la Junta de Subastas de la Policía sobre el cumplimiento de Telefónica con los requisitos y condiciones de la subasta, incluyendo aquellos relacionados a la programación. No existe base en el expediente ante nuestra consideración que nos lleve a concluir que en la adjudicación de la buena pro a favor de Telefónica medió arbitrariedad, fraude o mala fe de parte de la agencia. Torres v. Junta, *supra*. Debemos tener presente que la Policía constituyó un Equipo Evaluador que, según refleja su Informe Técnico, llevó a cabo un análisis realista y exhaustivo de las propuestas en varias etapas. Por ello, no podemos refrendar la conclusión del foro apelativo de que la evaluación de las referidas propuestas se limitó a determinar si las licitadoras habían presentado la documentación técnica de los equipos ofertados. Ese era uno de los requisitos con los cuales todas las

---

[9] Al realizar los referidos ajustes el resultado es el siguiente: Guardian, $3,714,000.27; Telefónica, $4,905,427.18; y Caribbean Communications, $5,408,670.00.

postoras debían cumplir, por lo que, naturalmente, se incluiría como parte de la evaluación de las ofertas.

Por último, tampoco existe indicio ni base alguna en el expediente que pueda llevarnos a concluir que la Policía no posee la pericia adecuada para evaluar la programación requerida para el sistema de vigilancia inteligente. Nótese que el RFP –documento sumamente técnico y detallado– fue preparado por el Negociado de Tecnología y Comunicaciones de la Policía, ente de la agencia especializado en estos asuntos. Además, la evaluación de las propuestas incluyó el asesoramiento de un especialista en sistemas de información y un programador de sistemas, según lo permite el propio Reglamento de la agencia. Art. 19, inciso B, Reglamento Núm. 5850, *supra*. Consideramos que tanto lo anterior, como la experiencia de la Policía en materia de seguridad y vigilancia, colocan a dicha agencia en mejor posición que el foro judicial para seleccionar al postor que mejor se ajuste al interés público. Véanse Perfect Cleaning v. Centro Cardiovascular, *supra*; Accumail v. Junta de Subastas, *supra*; Empresas Toledo v. Junta de Subastas, *supra*; AEE v. Maxon, *supra*. Abusó de su discreción el foro apelativo al concluir lo contrario.

Resolvemos, por tanto, que erró el Tribunal de Apelaciones al determinar que la Policía no llevó a cabo una evaluación realista de las ofertas presentadas y que dicha agencia no posee la pericia necesaria para evaluar la programación en controversia. Debido a que esta determinación dispone de la controversia ante nuestra consideración, no es necesario que

nos pronunciemos en torno a los señalamientos de error restantes.

## V

Por los fundamentos antes expuestos, revocamos el dictamen del Tribunal de Apelaciones y, en consecuencia, confirmamos la adjudicación de la subasta a favor de Telefónica.

Se dictará Sentencia de conformidad.

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Caribbean Communications
Solutions y otros

    Recurridas

    v.

Policía de Puerto Rico;
Junta de Subastas de la
Policía de Puerto Rico;
Junta de Reconsideración de
la Adm. de Servicios Generales

    Peticionarias

CC-2007-1061    Certiorari

Cons.CC-2007-1065

SENTENCIA

San Juan, Puerto Rico, a 24 de septiembre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca el dictamen del Tribunal de Apelaciones y, en consecuencia, se confirma la adjudicación de la subasta a favor de Telefónica.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta concurre con el resultado sin opinión escrita. La Juez Asociada señora Rodríguez Rodríguez disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Caribbean Communications
Solutions y otros

    Recurridas

       v.

Policía de Puerto Rico;
Junta de Subastas de la
Policía de Puerto Rico;
Junta de Reconsideración
de la Adm. de Servicios
Generales

    Peticionarias

|  |
|---|
| CC-2007-1061 |
| Cons. |
| CC-2007-1065 |

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 24 de septiembre de 2009

Disiento de la decisión que hoy anuncia este Tribunal porque entiendo que el proceso de "subasta gubernamental híbrido" que ha creado la mayoría no encuentra apoyo ni en la reglamentación ni en la legislación aplicable. Como tampoco encuentra eco en nuestra jurisprudencia anterior sobre los procesos de subasta gubernamental.

Soy del criterio que el relajamiento de los procesos de subastas que se avala en la opinión es contrario a lo que ha sido siempre nuestro norte a la hora de evaluar estos procedimientos que, como

sabemos son:  evitar la corrupción, el favoritismo, el dispendio y la prevaricación, para proteger de esta forma los intereses de los ciudadanos y salvaguardar el erario.

Por no estar conforme con haber legislado un procedimiento híbrido de subasta, al margen de una legislación en tal sentido, disiento del curso mayoritario.


Anabelle Rodríguez Rodríguez
Juez Asociada